Michael A. JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CO–1171.

District of Columbia Court of Appeals.

Argued March 28, 2006.

Decided March 15, 2007.

390

Ian A. Williams, Washington, appointed by the court, for appellant.

Thomas S. Rees, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the

time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese III, and David B. Goodhand, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and KRAMER, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

Appellant Michael Jones was convicted in a jury trial of a number of charges relating to two rapes which occurred in the same Washington, D.C. neighborhood in the Spring of 1985. More than fifteen years later, a motions judge denied, without a hearing, the latest in a series of motions filed by appellant in which he alleged, pursuant to D.C.Code § 23–110 (2001), that his trial counsel's failure to interview and call at trial two critical alibi witnesses constituted ineffective assistance of counsel. Appellant argues that the motions judge erred in denying a hearing on his § 23–110 motion. We conclude that the motions judge acted prematurely in denying the motion.

**I.**

On December 18, 1985, a grand jury indicted appellant on twenty-six charges arising from the rapes of three women, whom we identify as AA, LL, and NN. For the incident involving AA, appellant was charged with one count each of armed robbery,[1] kidnaping while armed,[2] sodomy,[3] and rape while armed.[4] For the incident involving LL, appellant was charged with one count each of destroying property,[5] armed robbery, rape while armed, assault with intent to kill while armed,[6] first degree theft,[7] and unauthorized use of a motor vehicle;[8] and two counts of first degree burglary while armed.[9] Finally, for the incident involving NN, appellant was charged with one count each of destroying property, armed robbery, rape while armed, and first degree theft; two counts of first degree burglary while armed; and three counts of kidnaping while armed.[10] Appellant's trial commenced on February 18, 1986 before the Honorable Robert M. Scott. Attorney Jeffrey Lewis represented appellant.

At trial, AA testified that on January 23, 1985, at approximately 10:00 p.m., she ar-

---

**1.** D.C.Code §§ 22–2901 and –3202 (1981) (recodified at D.C.Code §§ 22–2801 and –4502 (2001)).

**2.** D.C.Code §§ 22–2101 and –3202 (1981) (recodified at D.C.Code §§ 22–2001 and –4502 (2001)).

**3.** D.C.Code § 22–3502 (1981) (recodified at D.C.Code § 22–3006 (2001)).

**4.** D.C.Code §§ 22–2801 and –3202 (1981) (recodified at D.C.Code §§ 22–3002 and –4502 (2001)).

**5.** D.C.Code § 22–403 (1981) (recodified at D.C.Code § 22–303 (2001)).

**6.** D.C.Code §§ 22–501 and –3202 (1981) (recodified at D.C.Code §§ 22–401 and –4502 (2001)).

**7.** D.C.Code §§ 22–3811 and –3812(a) (1981) (recodified at D.C.Code §§ 22–3211 and –3212(a) (2001)).

**8.** D.C.Code § 22–3815 (1981) (recodified at D.C.Code § 22–3215 (2001)).

**9.** D.C.Code §§ 22–1801(a) and –3202 (1981) (recodified at D.C.Code §§ 22–801 and –4502 (2001)).

**10.** In the same indictment, appellant was charged with several offenses stemming from a burglary that was unrelated to the other three incidents. These charges were initially severed from the charges relating to the three rapes, and ultimately dismissed.

rived at an apartment building in the 1600 block of Harvard Street, N.W., where she was staying with friends. After AA unlocked the front door and entered the building, a stranger followed her inside and onto an elevator. When the elevator doors closed, the stranger produced a knife and demanded money and her watch. He then led her to an empty room in the building's basement where he forced her to perform an oral sex act and have sexual intercourse with him. Later, when describing the assault to a police officer, AA stated that her assailant asked her if she "had ever had sex with a black man."

At trial, AA testified that she observed her assailant for approximately a minute as she stood outside the apartment building, and got "a good look" at him at that time. She further stated that the elevator in which he drew the knife was well-lit, and that a light was on in the room in which she was assaulted. According to AA, she was also able to observe her assailant as he led her from the elevator to the empty room.

AA described her assailant to the police as a 24– to 30–year–old African American male who stood between 5'4" and 5'8" tall and weighed between 150 and 160 pounds. She stated that her assailant was not circumcised. At trial, the prosecutor read into evidence a stipulation by the defense that appellant was not circumcised.

Detective Vivian Coleman of the District of Columbia Metropolitan Police Department ("MPD") testified that on February 2, 1985, AA viewed a photo spread which did not include appellant's photo. Although AA identified a man in one of the photographs as her assailant, Detective Coleman learned that the man was incarcerated at the time of the assault.

AA attended lineups on March 6, 1985 and November 5, 1985. Although she did not identify any of the individuals in the first lineup as her assailant,[11] she picked appellant out of the second lineup. At trial, AA made an in-court identification of appellant.

LL testified that she attended a wine tasting on March 14, 1985.[12] At approximately 10 p.m., she returned to her home on the 2600 block of Klingle Road. LL's husband was out of town on business. Shortly after LL arrived home, an intruder smashed open a plate glass window with a rock and entered LL's bedroom. When LL screamed, the intruder placed his hand over LL's mouth and ordered her to stop. He then turned her around, so that she faced away from him, placed a knife to her throat and ordered her not to look at him.[13]

The intruder asked if anyone else was in the house. LL lied, claiming that her husband was home. The intruder dragged LL from room to room to verify that they were alone. While in the kitchen, he picked up a large meat cleaver, which he held to LL's throat. He subsequently rummaged through LL's purse and dresser drawers, looking for items of value.

The intruder brought LL into the living room, where he ordered her to disrobe. LL complied. The intruder bound her

11. There was no testimony at trial as to whether appellant was in the March 6, 1985 lineup. However, as he apparently did not become a suspect until he was stopped and fingerprinted on April 28, 1985, see infra, it appears unlikely that he was in the March lineup.

12. LL stated that she drank approximately five to six ounces of wine two hours before returning home. According to LL, when she arrived home, she felt no effects from the wine.

13. LL testified that the intruder repeated this order "[n]umerous times" while in her home.

wrists with her stockings and blindfolded her with her blouse. After asking her "if she had ever been fucked by a black man," he forced her to engage in sexual intercourse. When the assault was finished, LL's assailant asked for the location of her car keys, then strangled LL with a stereo cord until she lost consciousness. When LL regained consciousness approximately ten minutes later, she heard a car engine starting up. She later discovered that her car was missing.[14]

LL testified that she had the opportunity to observe her assailant's face for eight to ten seconds when he first entered her bedroom. She further stated that twice, as her assailant dragged her through the house, she looked up and observed his profile for up to five seconds. According to LL, all of the occasions on which she observed her assailant occurred in well-lit rooms.

At trial, LL described her assailant as a black male, approximately twenty-four or twenty-five years old and about 5′8″ to 5′10″ tall.[15] She testified that he wore blue jeans, white sneakers, a dark blue jacket and a red cap.

LL attended two lineups. Although she did not see her assailant in the first lineup—at which appellant was not present—at the second lineup, she identified appellant as the man who raped her. At trial, LL made an in-court identification of appellant. She testified that there was no doubt in her mind that appellant was her assailant.

NN testified that on April 22, 1985, at approximately 10:00 a.m., she was making a bed in her home on the 2700 block of Quebec Street, N.W. Her six-year-old son,

her two-year-old daughter and her one-year-old daughter were with her in the room. NN turned around when she heard her one-year-old daughter scream. A stranger stood in the room holding a knife and a pipe. After telling NN that he would kill her if she made any noise, the intruder put the knife to NN's neck, grabbed the back of her collar and dragged her from room to room. He then ordered NN's children to shut themselves in the library.

The intruder took NN to a room she described as the television room, where he bound her hands behind her back with a pair of stockings and blindfolded her with a black t-shirt. He then forced NN to have sexual intercourse with him. When he was finished, NN's assailant instructed NN to wait forty minutes before calling the police, bragging that the police "wanted him badly" but would not catch him. At some point, he cut all of the telephone cords in the house and ransacked the house, taking various items of value.

NN testified that, on the morning of the assault, she had left a screen door at the side of the house latched but otherwise unlocked. She stated that no other doors were unlocked. Next to NN's basement door, investigating officers recovered a set of latent fingerprints from a window sill and a latent palm print from the frame of the same window's screen. It is not entirely clear from the printed record exactly where the basement door was in proximity to the door that NN said was unlocked.

On Sunday, April 28, 1985, NN received a phone call in which a voice she recognized as that of her assailant told her that

14. Several items of value were also taken from inside the home.

15. A police officer who questioned LL shortly after the assault testified that LL described

her assailant as an African American male, who was under thirty years old and approximately six feet tall.

she should not have called the police and threatened to kill her. The next day she received a second call in which the same voice said, "Today is Monday."

NN testified that when she first saw her assailant, it was "broad daylight" outside, and the daylight illuminated the room. She further maintained that she "got a good look at his face." She described her assailant to the police as a twenty-six-year-old African American male who stood 5'8" tall, had a slim build and wore jeans, a red baseball hat and white tennis shoes. She further stated that his face was darkly complected and clean shaven.

In describing her assailant at trial, NN repeated most of the details she had provided to the police, adding that she is 5'4", and that her attacker was "just a little bit taller" than she is.[16] In contrast to what she had told the police, however, she stated at trial that the man who attacked her had a "lighter brown complexion," little moles or pimples on his face and "a little hair right on his chin."

On November 5, 1985, NN attended a lineup at which she asserted that she did not see her assailant. At trial, she testified that she had actually recognized appellant in the lineup, but failed to identify him because she was frightened and felt as if she might pass out. NN called the police approximately two weeks after the lineup, informing them that she had felt ill on the day of the lineup. When she returned to the police station, she was shown a photograph of the November 5 lineup, from which she picked appellant as her assailant. At trial, NN made an in-court identification of appellant, asserting that

she was certain that he was the man who raped her and that she "could never forget his face."

MPD Detective Lawrence Noyes testified that, in the Spring of 1985, as part of its investigation of the assaults on LL and NN, the police department had assigned a special detail to monitor the neighborhood in which the assaults occurred. Officers assigned to the area were on the lookout for a black male in his twenties, weighing approximately 160 pounds, standing between 5'10" and 6' tall and wearing blue jeans, white tennis shoes and a red baseball cap. At some time around 1 a.m. on April 28, 1985, Detective Noyes received a call from another officer claiming to have spotted a suspect who fit the lookout description and requesting back-up.[17]

When Detective Noyes responded to the call, he saw appellant in an area approximately fifty yards from LL's home and one block from NN's home. Appellant wore white tennis shoes. Although the officer who initially spotted appellant had stated that he wore a red baseball cap, appellant's head was now bare. Detective Noyes noticed, however, that appellant's hair was indented in a circular manner—as if he had recently been wearing a hat—and that a red baseball cap stuck out of his coat pocket. According to Detective Noyes, the cap bore a "Popeyes" logo.

With appellant's consent, the officers photographed appellant, and he was then released. Detective Patrick Shine subsequently obtained an inked set of appellant's palm prints and fingerprints.[18] The following day, when appellant's prints were

---

16. Appellant testified that he is six feet tall.

17. NN received the first of the phone calls from the person whose voice she recognized as her assailant's later that same day.

18. Although Detective Shine described the set of prints he obtained as "fingerprints," the testimony of the fingerprint expert who matched those prints with the prints found at the crime scene reveals that they included palm prints as well.

compared to prints discovered at NN's residence, the two sets of prints were found to match.

Later that day, Detective Shine attempted to execute an arrest warrant at a Popeyes fast food restaurant in Southeast Washington, D.C., and at the home of appellant's mother, but was unsuccessful. Detective Shine stated that he subsequently learned that appellant had not been employed at "the Popeyes" since March 1985. He did not identify the person who informed him that appellant no longer worked there. Nor did he state whether appellant was said to have stopped working only at that Popeyes restaurant or at other Popeyes restaurants as well.

Detective Shine informed appellant's mother that a warrant had been issued for appellant's arrest. Appellant was not arrested until November 1, 1985, when he was apprehended in front of his mother's home. Detective Shine interrogated appellant following his arrest. Appellant informed Detective Shine that, for at least a part of the period between April 29, 1985 and November 1, 1985, he had been in New York City, living with his grandfather. According to Detective Shine, appellant indicated that he was aware of the warrant issued for his arrest, but that his mother's boyfriend had advised him to leave town.

At trial, FBI agents trained in serology testified as to inconclusive results of tests on blood and semen samples taken from the three victims. All three victims were Type A secretors and appellant was a Type O secretor, both of which were typical of a sizeable percentage of the population.[19]

Appellant's uncle testified for the defense. He stated that he was a construction contractor who renovated and remodeled existing homes and built new homes. Appellant had worked with his uncle on a sporadic basis since 1983, although he was not working for his uncle at the time of the assaults. According to his uncle, appellant was employed as an apprentice carpenter.

Appellant testified on his own behalf. He denied having had any contact with any of the complainants. Appellant claimed that he left the District of Columbia on April 30 or May 1, 1985 to live with his grandfather, because, after being denied admission to an educational workshop, being robbed, and then stopped by the police, all on the same day, he "just decided Washington wasn't for me no more."

Appellant denied that he knew that the police were looking for him before he left for New York, claiming that he first became aware of the arrest warrant after he returned to the District of Columbia. Appellant further denied that his mother's

19. On redirect, an agent acknowledged that at the time of trial, which was in 1986, the science of serology was not yet "at the state where you can identify the person who left blood or deposited a seminal stain." DNA tests were apparently not yet available. A law review article published in 1989 noted that at the time of publication, "DNA typing tests [were] currently being performed by only three commercial laboratories in the United States, but plans [were] underway to make the tests available at a number of crime laboratories nationwide." William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests,* 75 VA. L.REV. 45, 108 n. 5 (1989). According to the article, "The FBI has instituted a program for training forensic scientists from state crime laboratories in the procedure. John Hicks, the director of the FBI program, predicts that DNA typing will become routine in about three years." *Id.* (citation omitted). Our first opinion dealing with the admissibility of DNA evidence, *United States v. Porter,* 618 A.2d 629 (D.C.1992), was published in 1992 and involved a case in which the indictment was filed in 1990. *Id.* at 630. The briefs to us make no mention of the present availability of any potential DNA evidence in this case.

boyfriend advised him to leave town, although he stated that after he returned from New York, his mother told him to "stay out of [the police's] way and don't give them no reason for them to ... stop you or anything like that."

Appellant attempted to explain the presence of his prints at NN's residence. He testified that, sometime in early April 1985, he lost his way while hiking in Rock Creek Park [20] and found himself in somebody's back yard. He further stated that he "decided to look into the window of the house ... just to see how it was built, just for a few moments." According to appellant, "[A] lot of old homes have modern construction in their inside and a lot of modern homes have early settings in the inside."

Appellant also attempted to explain his presence in the vicinity of the NN and LL homes at 1 a.m. on April 28, 1985. He testified that, on the afternoon of April 27, 1985, two unidentified individuals robbed him at the intersection of Connecticut Avenue and Porter Street, N.W., cutting his hand in the process. He further stated that a neighbor picked him up on Adams Mill Road at approximately 6 p.m. and drove him to the hospital, where he stayed for approximately four or five hours.[21] According to appellant, after returning to his home at 1321 Fairmont Street, N.W., he walked back to Connecticut and Porter to look for a backpack he had left behind. He was on his way to Connecticut and Porter when the police stopped him.

Appellant testified that he had worked for the Popeyes restaurants chain at twelve different locations in New York and the District of Columbia. When first asked when he worked for the company, he replied, "I began in 1980. And I stopped working at Popeyes I believe ... in the summer of '85." When asked specifically when he stopped working at Popeyes in the District of Columbia, appellant answered, 'I would say in early March.'" During cross-examination, appellant stated, "In April I wasn't working. I wasn't working because I was ... getting myself prepared to go to New York." Later, when the prosecutor asked if appellant was still working on March 14, 1985, he answered, "No, sir." Appellant further explained that he knew that it was in April 1985 when he became lost while hiking, because he quit his job in March and "started hiking deeply in April."

Appellant testified that he believed that he was in Silver Spring, Maryland at the time that AA was assaulted, but was not entirely certain. He was unable to account for his whereabouts at the times of the assaults on LL and NN. He maintained, however, that he had never been inside the homes of either LL or NN, nor

---

**20.** On direct examination, appellant identified the park in which he was hiking as "Pierce Mill Park." On cross-examination, however, he stated that he was in Rock Creek Park. He agreed that it was the "area of Rock Creek Park behind the zoo." Quebec Street, east of Connecticut Avenue, which includes the 2700 block, dead-ends into a portion of Rock Creek Park fairly near Pierce Mill. One of the investigating officers described the area around that block of Quebec Street as "heavily wooded." According to the officer, "You come down Quebec from Connecticut Avenue.... Then you enter almost what looks like a dead-end street into a wooded area and there are several houses back there."

**21.** Appellant's neighbor Vonnie Bower testified that, on April 27, 1985, at some time after 5 p.m., she was driving on the 3200 block of Adams Mill Road, between Klingle Road and Walbridge Place, when she encountered appellant. According to Ms. Bower, she saw that appellant was bleeding and had his jacket wrapped around his arm. Ms. Bower gave appellant a ride to the Washington Hospital Center.

the apartment building where AA was raped.

On February 25, 1986, the jury found appellant not guilty of all the charges relating to the assault on AA and guilty of all of the charges relating to the assaults on LL and NN. The trial court subsequently vacated appellant's two convictions for first degree burglary while armed, as well as his conviction for unauthorized use of a motor vehicle.

On May 8, 1986, appellant filed an appeal in which he was represented by new counsel, Richard S. Stolker. The appeal included no claims of ineffective assistance of trial counsel.[22] We affirmed appellant's conviction in an unpublished Memorandum Opinion and Judgment. *Jones v. United States*, No. 86–CF–761 (February 12, 1988). We subsequently appointed Kenneth D. Auerbach to represent appellant on a writ of certiorari to the Supreme Court of the United States. *See Corley v. United States*, 416 A.2d 713, 714 (D.C. 1980) ("[T]he assistance of compensated counsel in preparation of a petition for writ of certiorari is within the intent and coverage of D.C.Code 1978 Supp., § 11–2603 representation 'through appeals.'"). The Court denied the petition on October 3,

1988. 488 U.S. 860, 109 S.Ct. 155, 102 L.Ed.2d 127.

## II.

On September 12, 1986, appellant wrote a letter to the Honorable Fred B. Ugast, then Chief Judge of the Superior Court of the District of Columbia. In the letter, appellant alleged that his trial counsel was ineffective and requested "assistance in referring [his] case to the Public Defender Service." Appellant faulted his attorney in particular for failing to conduct a proper investigation and failing to present "exculpatory materials germane to [his] case." Appellant failed, however, to identify the exculpatory materials. Chief Judge Ugast forwarded the letter to Judge Scott, who responded to appellant in a subsequent letter providing the name and address of appellant's newly appointed appellate counsel.

Subsequently, following final affirmance of his convictions, from December 30, 1988 to July 25, 1989, appellant sent a series of letters to Judge Scott in which he argued, *inter alia*, that both his trial counsel and his appellate counsel had proven ineffective in their failure to adequately investi-

---

**22.** In the appeal, appellant claimed only that the trial court erred in failing to sever the trial on the charges related to the assault on LL from those stemming from the assault on NN. We note that appellant's failure to raise a claim of ineffective assistance of counsel on direct appeal did not bar him from later raising that claim, despite our holding in *Shepard v. United States*, 533 A.2d 1278 (D.C.1987). In *Shepard*, we held that

if an appellant does not raise a claim of ineffective assistance of counsel during the pendency of the direct appeal, when at that time appellant demonstrably knew or should have known of the grounds for alleging counsel's ineffectiveness, that procedural default will be a barrier to this court's consideration of appellant's claim.

*Id.* at 1280. We concluded that a defendant may overcome that barriers only upon a showing of "cause and prejudice." *Id.* at 1282. We also stated, however, that "[o]ur holding that a showing of cause and prejudice is a prerequisite to this court's review of an appellant's claim where there has been such a procedural default ... is prospective." *Id.*

We decided *Shepard* on December 2, 1987. Appellant filed his notice of appeal on May 8, 1986. As his appeal was pending at the time of our decision in *Shepard*, the holding in that case would not have applied. *See Ellerbe v. United States*, 545 A.2d 1197, 1198 (D.C.1988) ("Since our opinion in *Shepard, supra*, is prospective only ... we address, as we did in that case, the merits of the claim that the motions court erred in denying the § 23–110 motion without a hearing.").

gate his case and requested that he be appointed new counsel and an investigator.[23] On August 8, 1989, Judge Scott entered an order, construing the letters as "three separate *pro se* motions" and denying all three.[24]

On April 4, 1994, appellant wrote a letter to the Clerk of the Superior Court, requesting that his case be "opened and an attorney appointed." According to the letter, appellant had discovered in 1988 that "he [was] working at the time of one of the crimes." [25] He further asserted, "I have a time card, an application and three (3)

affidavits." [26] On April 15, 1994, the Honorable Reggie Walton entered an order construing the letter as a *pro se* motion for a new trial and appointment of counsel based on the discovery of new evidence, pursuant to Super. Ct.Crim. R. 33, and denying the motion as untimely.[27] On April 27, 1994 and May 10, 1994, appellant sent two subsequent letters, both of which Judge Walton construed as *"pro se* motion[s] for the appointment of counsel, for the purposes of apparently petitioning for new trial," and both of which he denied as untimely.[28] On June 21, 2000, Judge Wal-

**23.** Appellant forwarded Judge Scott a letter, dated November 21, 1998, from Auerbach, the attorney who filed appellant's petition for a writ of certiorari. In the letter, Auerbach stated, "I have discussed the case with some members of your family, who now state that you may have witnesses to prove that you were not at the scene of at least one of the crimes on the date and time alleged." The attorney advised appellant to "write a letter to [Judge Scott] requesting that he approve appointment of an attorney and investigative services under the [Criminal Justice Act]," and informed appellant, "without appointment by Judge Scott, I cannot continue working on your case."

**24.** Judge Scott treated the letters as (1) a § 23–110 motion alleging ineffective assistance of trial counsel and ineffective assistance of appellate counsel; (2) a Motion for a New Trial pursuant to Super. Ct.Crim. R. 33; and (3) a Motion to Reduce Sentence pursuant to Super. Ct.Crim. R. 35(b). With regard to appellant's ineffective assistance of counsel claims, Judge Scott concluded that, under *Shepard, supra,* appellant's "failure to raise [the claims] on direct appeal bars him from subsequently attacking his conviction on that ground," and that the claims of ineffective assistance of appellate counsel "are not properly presented to or considered by this court." For the reasons provided above, *supra* note 22, Judge Scott's retroactive application of *Shepard* appears to have been erroneous. Judge Scott died on September 16, 1992.

**25.** Appellant attributed his failure to file any motions between 1989 and 1993 to medical problems.

**26.** Appellant did not state in the letter when he obtained the time card and other employment related documents. As explained *infra,* he later stated that he acquired the documents in 1992.

**27.** At the time of the order, Super. Ct.Crim. R. 33 (1998) provided that "[a] motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment." The rule has subsequently been amended and now provides that "[a] motion for a new trial based on newly discovered evidence may be made only before or within three years after the verdict or finding of guilty." Super. Ct. Crim. R. 33 (2006).

In the order, Judge Walton presented, in a footnote, an alternative ground for denying appellant's motion. Relying on our decision in *Huggins v. United States,* 333 A.2d 385 (D.C.1975), he posited that appellant's "assertion that he only recently discovered that he was working at the time of one of the offenses for which he was convicted is not 'newly discovered evidence' pursuant to Rule 33." In *Huggins,* we held that "evidence which could have been discovered with due diligence before trial cannot be the basis of a new trial if it is not recognized until after judgment." *Id.* at 387.

**28.** In the first of these orders, entered on May 6, 1994, Judge Walton denied the motion "for the reasons presented in [his] Order of April 15, 1994." In the second of these orders, Judge Walton denied the motion "for the reasons set forth in [his] Orders of May 6, 1994

ton denied, without explanation, a motion for production of documents and evidence and a motion for appointment of counsel, both of which were filed by appellant on November 10, 1999.

Appellant eventually obtained new counsel.[29] On August 8, 2001, appellant filed, through Peter Mann, his new attorney, the § 23–110 motion that is the subject of this appeal. In the motion, appellant contended that his trial counsel failed to discover and call two alibi witnesses.[30] Appellant attached three supporting affidavits.

In the first affidavit, appellant stated that at the time of trial, he was uncertain about where he was on March 14, 1985 or April 22, 1985. Appellant, who claimed to have suffered from hepatitis since he was fifteen, further asserted that, on March 12, 1985, his excessive alcohol consumption caused a "worsening" of his condition. As a result, appellant fell extremely ill. He did not specify where he spent the night of March 12. According to appellant, despite his illness, he attempted to go to work at a Popeyes restaurant on March 13. When he arrived, however, he informed his supervisor that he was too ill to work. An argument ensued, ending when appellant quit his job. According to appellant, because of his illness, he remained at his sister's house from March 13 until March 15. He further claimed that his trial counsel ignored his request to talk to members of his family and establish whether they could account for his whereabouts and, perhaps, provide an alibi.

According to appellant's affidavit, Popeyes rehired him in April of 1985. Appellant claimed that he "was scheduled to work from 10:00 a.m. until 5:30 p.m. on April 22, 1985," but that documents he obtained from Popeyes established that, on that date, he actually worked from 6:32 a.m. until 5:32 p.m., with a break from noon until 1:12 p.m. Appellant further stated that, prior to trial, he was uncertain about where he was on April 22, 1985.

According to appellant, his trial counsel did not comply with his requests to obtain his employment records and interview Andre Williams, a co-worker who appellant believed might be able to provide an alibi. Appellant further stated that his attorney claimed that he could not locate Mr. Williams and ignored appellant's request to seek a continuance in order to find him.[31]

In a second affidavit, appellant's sister, Malisa Jones, stated that, after her brother became ill on March 12, 1985, he spent the night at her house. She claimed that her brother was "bedridden" on March 13, 14, and 15, 1985, because of his illness. She further asserted that "[appellant] did not leave [her] house at anytime during" that period. Ms. Jones did not explain why she had not previously come forward with this information.

In the third and final affidavit, Andre Williams stated that he had known appellant "since childhood," and that the two worked together at a Popeyes restaurant at 14 and I Streets, N.W. Mr. Williams claimed that on April 22, 1985, he worked

---

and April 15, 1994." He provided no further citation. According to Judge Walton, "All [of the] motions raise exactly the same issues."

**29.** It is not clear from the record how this came about. Nor was appellate counsel before us able to provide further information.

**30.** Appellant maintained that his appellate counsel ignored his request that he raise these claims during his direct appeal.

**31.** Appellant also claimed that his appellate counsel disobeyed his express instructions to raise claims of ineffective assistance of trial counsel in his direct appeal.

from 10:00 a.m. until 5:30 p.m., while appellant worked from 6:30 a.m. until 5:30 p.m. Although Mr. Williams did not explain how he knew that appellant worked from 6:30 a.m. until 10:00 a.m., when he himself was not working at that time, he did assert that he "was physically present with Michael Jones in the Popeyes Restaurant from 10:00 until 5:20 p.m. except for the time when he clocked out for lunch." [32] Mr. Williams further attested that, in 1992, he obtained from Popeyes an information sheet, a time sheet, and a work schedule, all of which related to appellant's employment at Popeyes in April 1985.[33]

In addition to the affidavits, appellant attached documents he claimed were the information sheet, time sheet, and work schedule obtained by Mr. Williams. A line on the information sheet requesting a "date available" bears the handwritten answer: "4–19–85." The work schedule shows a Michael Jones scheduled for a Monday that fell on the 22nd of some month, but does not provide an actual month or year. According to the time sheet, a Michael Jones punched in on a Monday at 6:30 a.m, punched out at 12:20 p.m., punched back in at 1:10 p.m., and finally punched out at 5:20 p.m.[34] No specific dates are provided on the time sheet, however, other than a pay date of April 28.

In its opposition to the motion, the government argued, *inter alia*, that appellant's claims were "so 'palpably incredible,' so 'patently frivolous or false' as to warrant summary denial." *See Blackledge v. Allison*, 431 U.S. 63, 76, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). According to the government, appellant's "affidavits and exhibits contradict his trial testimony, and are inconsistent with each other."

The government first observed that "appellant states in his affidavit that he went to work on March 13, 1985, had an argument with his supervisor and terminated his employment, while his sister states 'he did not leave my house at any time during March 13, 1985, March 14, 1985 and March 15, 1985.' "

The government next stated:

[Appellant's] trial testimony is inconsistent with Mr. Williams'[s] proposed alibi defense. For example, Mr. Williams states that the defendant was physically present with him working at Popeyes on April 22, 1985. By contrast, [appellant] testified that he was not working in April 1985, because he was getting ready to go to New York.

Finally, the government noted:

[T]he alleged Popeyes' work schedule and time sheets that Mr. Williams obtained in 1992 are inconsistent with each other. According to [the work schedule], [appellant] was to work Monday through Thursday, from 10:00 a.m. to 5:30 p.m.; [appellant's] time card does not match [appellant's] work schedule, because [appellant's] time card shows him beginning work at the same time between 6:30 and 7:00 a.m. on each day, not 10:00 a.m. and does not have [appellant] punching out on Tuesday at all. Also, [appellant] was scheduled to work on Saturday, April 27, 1985, between 10:00 a.m. and 5:30 p.m., but [appellant's] trial testimony contradicts this schedule. [Appellant] said that he did not work in April, and on April 27, went to Wilson High School to check on a job

---

32. NN was assaulted at approximately 10:00 a.m. on April 22, 1985.

33. Neither appellant nor Mr. Williams explained why these documents were not obtained until 1992, where Mr. Jones elsewhere asserted that he became aware that he was working in 1988. *See supra* note 26 and accompanying text.

34. April 22 fell on a Monday in 1985.

program and then was robbed and had to go to the hospital.[35]

In his response to the government's opposition to the motion, appellant attempted to explain some of the apparent contradictions. Appellant argued the contradiction between his affidavit and his sister's affidavit was of "minimal significance," because both affidavits proved consistent about where appellant was on the date that LL was assaulted.[36] Appellant further argued "[t]hat the two affidavits differ as to certain non-essential matters can be deemed to support the credibility of the assertions contained in the two affidavits as the passage of time and the lack of direct communication between [appellant] and his sister have led to two versions of tangential events, each of which are untainted by the other."

With regard to the apparent contradictions between the claims made by appellant and Williams that appellant was working at Popeyes on April 22, 1985, and appellant's trial testimony that he stopped working there in March 1985 and was not working in April 1985, appellant argued that "he did not offer testimony as to his whereabouts on April 22, 1985, for the simple reason that as he candidly admitted he did not know where he was on that date" and that "[t]he statement that he was not working in April was intended to be only a generalized statement of [appel-

lant's] activities and was therefore also not inconsistent with the substance of Mr. William's affidavit." Appellant further noted that he became "confused at numerous intervals throughout [the trial]" regarding his whereabouts in April. Appellant did not attempt to explain the apparent inconsistencies between the work schedule and the time sheet, or between the work schedule and appellant's trial testimony. Appellant attached no supporting affidavits to his response.

On July 30, 2004, the Honorable Herbert B. Dixon entered an order denying appellant's § 23–110 motion on the merits.[37] Judge Dixon concluded that appellant failed to demonstrate either that his counsel performed deficiently or that, if his counsel had performed deficiently, appellant was prejudiced by the deficient performance. According to Judge Dixon, appellant was not entitled to a hearing, because "the existing record and case law conclusively establish that [appellant] is not entitled to any relief."

Judge Dixon based his conclusions largely on the apparent contradictions identified by the government. He observed that appellant's assertion in his affidavit that he went to work on March 13 contradicted the claim, made by his sister, that he did not leave her house on March 13, 14, or 15, 1985. He further noted an additional contradiction not mentioned by

**35.** The government also pointed to appellant's failure to offer an explanation as to why his sister did not come forward sooner. The government did not argue to the trial court that, due to the strength of its case, the alibi evidence would have made no difference to the verdict.

**36.** In the opposition, appellant's counsel incorrectly asserted that the assault occurred on March 12, 1985, when, in fact, it occurred on March 14, 1985. Apparently working under the mistaken impression that the assault had, in fact, occurred on March 12, counsel asserted that the affidavits of appellant and his

sister placed appellant at their mother's birthday party on the date of the assault. Despite this error, counsel's underlying argument, that both affidavits were consistent as to appellant's whereabouts on the date of LL's assault, was correct. In their affidavits, appellant and his sister both claimed that appellant never left his sister's house on March 14.

**37.** The government did not argue to the trial court that appellant was procedurally barred from raising his claims, and the trial court cited no procedural barriers to a consideration of those claims on the merits.

the government: at one point in his affidavit, appellant himself stated that he did not leave the house between March 13 and March 15, but elsewhere in the affidavit, stated that he went to work on March 13.

Judge Dixon agreed with the government's arguments that the claims that appellant worked at Popeyes on April 22, 1985 contradicted portions of appellant's trial testimony and that "appellant's time card and work schedule conflict as to the days and times worked, and [appellant's] own testimony conflicts with the work schedule that [appellant] submitted in support of the underlying motion." After the denial of his § 23–110 motion, appellant filed this appeal through new counsel.[38]

### III.

■■■ To prevail on his claim of ineffective assistance of counsel, appellant must establish: (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This court reviews a trial court's decision to deny a claim of ineffective assistance of counsel without a hearing for abuse of discretion. *Lane v. United States*, 737 A.2d 541, 548 (D.C.1999). However, the trial judge's legal conclusions are reviewed *de novo*. In particular, "we owe no deference to the trial court's legal conclusion as to whether counsel was deficient." *United States v. Little*, 851 A.2d 1280, 1287 n. 10 (D.C.2004).

■■■ "When a defendant in a § 23–110 motion raises a claim of ineffective assis-

---

**38.** Appellant's motion does not present any procedural problems. As noted previously, appellant's failure to raise his claims of ineffective assistance of counsel on direct appeal does not present a barrier to consideration of his claims on the merits, because our holding in *Shepard, supra*, does not apply retroactively. Moreover, although it could be argued that appellant's claims should be barred as successive, *see, e.g., Bradley v. United States*, 881 A.2d 640, 645 (D.C.2005), the government declined to argue this below and Judge Dixon entertained those claims on the merits. *See supra* note 37.

Although the government mentions potential procedural issues in a footnote in its brief to us, it argues only that we "need not reach" them "in view of [the] disposition on the merits." Therefore, we consider the procedural issues abandoned by the government on this appeal. *See Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993).

We further note that, despite appellant's filing of the § 23–110 motion that is the subject of this appeal more than fifteen years *after* he was convicted, he has continuously sought relief within that period—pausing only during the three-year period in which he claims to have had medical problems—and

cannot be said to have slept on his rights. Furthermore, we have "explicitly rejected the idea that a § 23–110 claim could be waived by a mere 'lapse of time and prejudice to the government.' " *Newman v. United States*, 705 A.2d 246, 263 n. 16 (D.C.1997) (citing *Ramsey v. United States*, 569 A.2d 142, 148 (D.C. 1990)). *But see Washington v. United States*, 834 A.2d 899, 903–04 n. 9 (D.C.2003) ("Although appellant's delay, by itself, does not bar the court from considering the motion, the passage of so much time makes it all the more difficult to assess appellant's claim of ineffective assistance. The longer the delay, the greater the difficulty." (citing *Dobson v. United States*, 711 A.2d 78, 84 (D.C.1998))). In *Dobson*, moreover, we stated:

[T]he trial court may consider the length of [appellant's] delay ... any excuses for that delay, and any resulting prejudice to the government.... [L]apse of time affects the quantum of required proof, as well as the good faith and credibility of the moving party. Finally, if the passage of time has impaired the recollections of participants in the trial ... then it is the party responsible for the delay that must be chargeable with the consequences.

711 A.2d at 84 (internal quotations, citations, and punctuation omitted).

tance of counsel, there is a presumption that the trial court should conduct a hearing." *Lane, supra,* 737 A.2d at 548 (citing *Newman, supra,* 705 A.2d at 261; *Gray v. United States,* 617 A.2d 521, 523 (D.C. 1992); *Sykes v. United States,* 585 A.2d 1335, 1339 (D.C.1991)). We "will affirm the trial court's denial of a § 23–110 motion without a hearing only if the claims (1) are 'palpably incredible'; (2) are 'vague and conclusory'; or (3) even if true, do not entitle the movant to relief." *Newman, supra,* 705 A.2d at 261 (quoting *Gregg v. United States,* 395 A.2d 36, 39 (D.C.1978)). Furthermore, "[i]n order to uphold the denial of a § 23–110 motion without a hearing, we must be satisfied that under no circumstances could the petitioner establish facts warranting relief." *Hilliard v. United States,* 879 A.2d 669, 671 (D.C. 2005) (citation omitted). "[A]ny question regarding the appropriateness of a hearing should be resolved in favor of holding a hearing." *Newman, supra,* 705 A.2d at 261 (citation omitted).

■ The presumption in favor of a hearing "is even stronger when the claim of ineffectiveness is based on facts that are not already disclosed in the record." *Lane, supra,* 737 A.2d at 548. "We have held, moreover, that where the exculpatory value of the evidence proffered by appellant turns at bottom on the credibility of the witnesses specifically identified in the § 23–110 motion and whose proposed testimony was evidenced by signed statements, we can discern no grounds for negating the credibility of those witnesses merely on the basis of their written statements." *Newman, supra,* 705 A.2d at 261 (citation and internal punctuation omitted). "To do

so assumes the answer to the very question which an evidentiary hearing could illuminate." *Id.* (citation and internal quotation omitted).

■ On the other hand, "the filing of such a § 23–110 motion does not automatically require the trial court to conduct a hearing." *Ready v. United States,* 620 A.2d 233, 234 (D.C.1993) (citing *Gibson v. United States,* 388 A.2d 1214, 1216 (D.C. 1978)). "Where the existing record provides an adequate basis for disposing of the motion, the trial court may rule on the motion without holding an evidentiary hearing." *Id.* (citing D.C.Code § 23–110; *Ellerbe, supra,* 545 A.2d at 1198–99). Moreover, "[w]hile demonstration of the failure to investigate and call witnesses can establish ineffective assistance of counsel, we have required an affidavit or other credible proffer as to the allegedly exculpatory nature of the prospective witnesses' testimony.'" *Forte v. United States,* 856 A.2d 567, 577 (D.C.2004) (internal quotations, citations and punctuation omitted); *see also Lopez v. United States,* 801 A.2d 39, 42 (D.C.2002); *Thomas v. United States,* 772 A.2d 818, 824 (D.C.2001); *Spencer v. United States,* 688 A.2d 412, 420 (D.C.1997); *Ready, supra,* 620 A.2d at 233.[39]

■ Judge Dixon concluded that appellant's "claim can be resolved entirely on the existing record because the proffered affidavits are contradictory, and also are in conflict with [appellant's] trial testimony." We are unable to agree that these apparent contradictions and conflicts are, on this record, sufficient, without more, to justify

---

**39.** We recently had occasion to reiterate these principles relating to the grant of a hearing with respect to a § 23–110 motion in *Long v. United States,* 910 A.2d 298, 306–09 (D.C. 2006). In *Long,* the trial court denied the motion without a hearing on the basis that,

even if true, the proffered testimony of an alibi witness would not have overcome the strength of the government's case. We reversed that determination that was made without a hearing.

denial of the motion. Appellant presented affidavits from himself and two witnesses stating that he was elsewhere at the time of the two assaults. He further presented documents purported to be work documents which arguably corroborate one of his alleged alibis. Although the various affidavits and documents contain some conflicting information, appellant offered, in his response to the government's opposition to his motion, possible explanations for at least some of those conflicts and has provided further possible explanations in his brief to us. To be sure, it could be incumbent upon defendants to provide such explanations to the trial court in affidavits. However, we cannot conclude, based on this record, that the contradictions in the various documents were so great as to render appellant's claims either "vague and conclusory" or "palpably incredible." *See Hilliard, supra,* 879 A.2d at 671. Nor can we say that, because of those contradictions, "under no circumstances could [appellant] establish facts warranting relief." *Id.* (citation omitted).

We agree with Judge Dixon that appellant's affidavit conflicted with the affidavit of his sister, Malisa Jones. According to Ms. Jones, appellant "spent the *entire* days of March 13, 1985, March 14, 1985 and March 15, 1985 at [her] house." (Emphasis added). Appellant claimed in his affidavit, however, that he briefly went to work on March 13, 1985. Appellant argued below, and repeats on appeal, that despite this apparent contradiction the two affidavits are not fatally irreconcilable, because the contradiction does not concern the date on which LL was attacked. Nor do they conflict on the fact of appellant's claimed incapacity. Although the conflict creates serious questions about the credibility and reliability of the claims made in the affidavits, it does not render those claims palpably incredible. Any credibility determinations, moreover, cannot be made on the affidavits alone. *See Newman, supra,* 705 A.2d at 261.

With regard to the conflicts concerning appellant's whereabouts and employment status on April 22, 1985, appellant's affidavit offers at least a partial explanation: in the affidavit, he maintains that at the time of trial, he could not recall his whereabouts on April 22, the date on which NN was assaulted. Moreover, the record tends to support his assertions, made in his response to the government's opposition papers, that "[t]he statement [at trial] that he was not working in April was intended to be only a generalized statement of [his] activities" and that he became "confused at numerous intervals throughout [the trial]" regarding his whereabouts in April, as well as his contention in his brief to us that his trial testimony was "the result of a natural failure to remember his whereabouts prior to having his recollection refreshed," while his affidavit "is the product of a refreshed recollection."

The transcript of the trial reveals little certainty or conviction on appellant's part when he makes the various statements concerning his employment status in March and April of 1985. When first asked when he stopped working at Popeyes in the District, appellant answered, "*I would say* in early March." (Emphasis added.) Later, while being cross-examined about his whereabouts in *January,* and in the midst of a lengthy cross-examination about whether, on the night that AA was attacked, appellant had gone to his girlfriend's house in Silver Spring, Maryland, or remained in the District of Columbia, appellant answered:

> Yes, sir. No it didn't, excuse me. I have to correct myself because I got a little confused. I am kind of nervous. At that time [January 23] when I was working there I was at Silver Spring. I

was living in Silver Spring. I was living on Belmont and then Silver Spring. But on April—in April I wasn't working. I wasn't working because I was looking—I was getting ready to go to New York. I was getting myself prepared to go to New York. That's why my fiance and I broke up, because I didn't consult into her, in her.[40]

The context and tenor of this testimony may suggest confusion rather than conviction.

Other assertions made by appellant at trial concerning his job status arguably do not entirely contradict the assertions appellant and Williams made in their affidavits. Appellant testified that he was not "still working on March 14, 1985," and claimed that he knew that it was early April when he became lost in the woods, because he had quit his job in March and "started hiking deeply in April." Neither of these statements are, by themselves, entirely inconsistent with the assertion made by appellant in his affidavit that he quit his job at Popeyes on March 13 but resumed working for the company in April, especially as the purported information sheet, if credited, suggests that appellant did not resume employment at Popeyes until April 19.

In his opposition, appellant offered no explanation for the contradictions between the purported work schedule and the purported time sheet. As noted by the government, according to the schedule, "appellant was to work Monday through Thursday, from 10:00 a.m. to 5:30 p.m.," but according to the time card, appellant began work "between 6:30 and 7:00 a.m. on each day, not 10:00 a.m., and did not punch out on Tuesday." In his brief to this court, however, appellant proposed a possible explanation for this discrepancy:

Many food-service employees routinely call in sick almost immediately before the beginning of their shift. Managers and supervisors thereupon scurry to contact the unassigned staff and often plead with them to substitute. Additionally, employees sometimes change shifts with each other in order to accommodate respective personal situations. A work schedule prepared at the beginning of a pay period will not reflect such last-minute changes. Therefore, Judge Dixon erred by failing to appreciate this fact and for treating the discrepancy as proof of an irreconcilable contradiction.

This explanation would also seem to account for the fact that, as the government notes, although "[appellant] was [allegedly] scheduled to work on Saturday, April 27, 1985, between 10:00 a.m. and 5:30 p.m., he testified at trial that 'on April 27, [he] went to Wilson High School to check on a job program and then was robbed and had to go to the hospital.'"[41] Although the schedule apparently shows that appellant was to work on Saturday, April 27, 1985, the time sheet for the week ending April 28, shows him working only on the Monday, Tuesday, Wednesday, and Thursday of that week.

---

**40.** Appellant quoted this passage in his response to the government's opposition.

**41.** The government did not argue, and does not argue now, that the affidavits contradicted Detective Shine's trial testimony that he learned that appellant had not been employed at Popeyes since March 1985. In his testimony, which was both hearsay and from an unidentified source, Detective Shine was unclear as to whether he had learned that appellant was no longer working at the particular Popeyes restaurant in which he looked for appellant, or was no longer working for the company at all. The context of the testimony, however, suggests the former interpretation. The Popeyes restaurant where Detective Shine looked for appellant is not the same restaurant in which Mr. Williams now claims that appellant worked in April.

Judge Dixon also observed that appellant's own affidavit was internally inconsistent. In the affidavit, appellant first states that he left his sister's house to go to work on March 13, 1985, but later asserts that he never left the house on March 13, 14, or 15. Appellant did not specifically address these apparent contradictions in his pleadings before Judge Dixon.[42] Nor does he specifically address them on appeal. However, the contradiction between the two statements is not self-evident. In the affidavit, immediately after describing his visit to work on March 13, appellant asserted, "Over the next several days, I remained ill as a result of the events of March 12, 1985. Because I was sick, I stayed at my sister, Malisa Jones's house on March 13, 1985, March 14, 1985, and March 15, 1985. I did not leave my sister's house at any time during those three days." Given the context, the statement could reasonably be interpreted as an assertion by appellant that he did not leave the house *after* he returned from the previously described confrontation with his supervisor.

The various hypothetical explanations proposed by appellant are not facially unreasonable. It is troubling, however, that although appellant has proposed explanations in his filings with Judge Dixon and with this court, he presented Judge Dixon with no affidavits in which any of the witnesses, including appellant himself, offer their own explanations. As such the hypothetical explanations appellant offers remain just that: *hypothetical* explanations. It could be argued that our decision in *Metts v. United States*, 877 A.2d 113 (D.C.2005) stands for the proposition that a defendant's burden to establish "the allegedly exculpatory nature of the prospec-

tive witnesses' testimony" by way of "affidavit or other credible proffer," includes the burden of explaining, by the very same means, any contradictions that would deprive the testimony of its exculpatory value. *Forte, supra,* 856 A.2d at 577 (internal quotations, citations, and punctuation omitted). The government, however, does not make this argument.

The government does cite *Metts* in support of its arguments that contradictions between trial testimony and statements made in a document attached to a § 23–110 motion can negate the exculpatory value of the statements attached to the motion to such an extent that no hearing is required. *Metts,* however, is distinguishable from the present case in several respects. There, in affirming the trial court's denial—without a hearing—of appellant's § 23–110 motion, we observed that the unsworn statements of two witnesses submitted with appellant's motion contradicted appellant's own account, at trial, of the shooting from which his convictions arose. 877 A.2d at 119–21.[43] We found that the first statement contained no exculpatory information, because the witness claimed only to have seen events that transpired before the shooting, and the "statement [made] clear that [the witness] did not see the shooting . . . at all." *Id.* at 119–20. We further observed that while the witness's statement could have been construed as placing the shooting inside of a barbershop, such a reading would have conflicted with appellant's trial testimony which placed it outside of the barbershop. *Id.* at 120.

Although we acknowledged that the second witness's statement implicated a third

**42.** This point was first raised *sua sponte* by Judge Dixon in his order denying appellant's § 23–110 motion.

**43.** Additional statements were found either to contain no exculpatory information or to consist solely of inadmissible hearsay. *Id.* at 120–22.

party as the perpetrator, we also noted that her version of events conflicted with the version presented by appellant at trial and "differ[ed] markedly" from the version recounted by the first witness. *Id.* at 120–21. We concluded that there was "no error in the trial judge's conclusion that this *undated, unsigned, and unsworn statement* [was] not sufficiently credible to require that a § 23–110 hearing be held." *Id.* at 120 (emphasis added).

Unlike the statement at issue in *Metts,* the statements in the present case were all signed, sworn, and dated. While that alone might be insufficient to meaningfully distinguish it from *Metts,*[44] several other factors suggest that *Metts* is not entirely on point. First, unlike the first statement in *Metts,* the statements submitted by appellant all include exculpatory information. Furthermore, the contradictions in *Metts* undermined appellant's version of the crime itself, thereby undercutting his entire defense. Here, the information called into question by the contradictions—appellant's whereabouts on March 14, 1985 and his work status in April 1985—was only introduced peripherally at trial. It was in no way central to his defense.

Finally, in *Metts,* we observed that after appellant filed his motion and made his initial proffer, "[t]he trial judge, recognizing that an additional credible proffer from one or more of these prospective witnesses *might* warrant a § 23–110 hearing, granted Mr. Metts a generous amount of time in which to present such evidence," and he failed to take advantage of the opportunity. *Id.* at 122. In contrast, in *Lanton, supra,* 779 A.2d at 900, the trial court declined to afford appellant an opportunity to supplement his motion before denying it on the grounds that, among other things, appellant failed to provide affidavits repeating allegations proffered in unsworn statements. In reversing the judgment of the trial court, we noted that the "case would be in a different posture, and denial of the motion without a hearing might have been appropriate, if the trial judge had given [appellant] a specified brief period to present his allegations and the allegations of his witnesses in affidavit form, and if [appellant] had failed to comply." *Id.* at 903–04 n. 10. Here, although appellant raised a far more colorable claim of ineffective assistance of counsel than the appellant in *Metts,* and although the very nature of the inconsistencies in the various statements suggests the possibility of reasonable explanations, Judge Dixon did not ask appellant to supplement his pleadings as the trial judge did in *Metts.*[45]

**44.** *See Metts, supra,* 877 A.2d at 120 (citing *Lanton v. United States,* 779 A.2d 895, 903 (D.C.2001) for the proposition that "it would surely exalt form over substance to deny a hearing simply because [a] statement is not notarized" (internal quotations and citation omitted)).

**45.** We note that here the government's opposition put appellant on notice that the contradictions were being scrutinized, and appellant had time to prepare additional affidavits which he could have included with his response to the government's opposition. It is not entirely clear from the text of the decision whether this was the case in *Metts.* In *Metts,* however, the trial judge provided appellant with the opportunity to supplement his pleadings in her initial order in which she also "denied most [his] claims." 877 A.2d at 117. The trial court's subsequent order, denying the remaining claims in appellant's § 23–110 motion, was granted only after the granting of "four extensions of time and the appointment of a 'Court Certified Investigator,'" at which point, appellant "had produced only one affidavit from his five prospective witnesses, which affidavit did not support his claim, and presented no 'other credible evidence' warranting a hearing." *Id.* The decision in *Metts* does not mention whether the government filed an opposition to § 23–110 motion. If it did, however, then presumably the order allowing appellant to supplement his pleadings was entered after the government presented

We are not disposed to cabin the trial court's discretion by any rigid rule requiring such actions on the part of trial judges, especially as it is the defendant who bears the burden of presenting a credible proffer that prima facie would satisfy the second prong of the *Strickland* test. In deciding whether to hold a hearing, the trial court has every right to expect the motion papers to present not only the evidence on which the movant relies but also his or her explanations of obvious impediments to the credibility of that evidence. However, in light of our previous holding that "once a movant makes a colorable claim which, if true, would provide a basis for relief, the trial court should not decide the matter summarily," *Newman, supra,* 705 A.2d at 262, in cases where, as here, contradictions and other impediments in "the motion and files and records of the case" present credibility problems if unresolved, providing the appellant with an opportunity to supplement his initial motion with affidavits explaining those obstacles to credibility could be a prudent course of action.

The statute itself requires a hearing "[u]nless the motion and files and records of the case *conclusively show* that the prisoner is entitled to no relief." *Hilliard, supra,* 879 A.2d at 670–71 (quoting D.C.Code § 23–110(c) (emphasis added)). Here, of course, at least some of the contradictions cast doubt on the credibility of the various witnesses' statements. Furthermore, as the government argues and the trial court noted, serious credibility concerns arise from appellant's apparent failure to remember, at trial, his whereabouts and employment status around the time of the assaults, as well as his sister's failure to come forward with her alibi testimony before trial. None of these factors can be said, however, to render appellant's

claims so facially invalid that they conclusively established in themselves that appellant was entitled to no relief. *See Newman, supra,* 705 A.2d at 261; *see also id.* at 262 (citing *Ramsey, supra,* 569 A.2d at 148–49, for the proposition that the "trial court may consider silence and delay as affecting credibility, but these factors do not themselves render claim incredible and thus subject to denial without a hearing").

With respect to the first prong of *Strickland,* barely touched upon by the motions judge, we think that appellant met his burden of "alleg[ing] facts which, if demonstrated, would establish ineffective assistance of counsel." *Lane, supra,* 737 A.2d at 548 (quoting *Johnson v. United States,* 385 A.2d 742, 744 (D.C.1978)). "We have recognized previously that the failure of trial counsel to investigate properly a case, 'to interview exculpatory witnesses, and to present their testimony constitutes constitutional ineffectiveness.'" *Lopez, supra,* 801 A.2d at 46 (internal quotation and citation omitted). Here, if believed, the various affidavits attached to appellant's § 23–110 motion, which provide alibis for the times of both assaults, present powerful assertions of innocence. Therefore, the allegations made by appellant in his motion, if true, demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052.

Appellant stated, in his affidavit, that his trial counsel ignored his requests to interview his family, contact Mr. Williams, and obtain his employment records. Of course, as the government correctly notes, decisions concerning which witnesses to call at trial are often based on tactical considerations, and therefore, gen-

its opposition and put appellant on notice of the deficiencies in his supporting documents.

erally remain within the discretion of the defense attorney. *See Lopez v. United States,* 863 A.2d 852, 861–62 (D.C.2004) ("[T]he decision to call witnesses is a judgment left almost exclusively to counsel" (citation omitted)); *Bell v. United States,* 260 A.2d 690, 691 (D.C.1970) ("The decision to call or not to call witnesses on behalf of a defendant is part of the strategy utilized by counsel in the preparation of the defense. It is a question of judgment, and this court will not engage in a subjective determination of the wisdom of counsel's strategy." (internal footnote omitted)).

Here, however, there is nothing in the record indicating that counsel's failure to call the alibi witnesses was a sound tactical decision, or, for that matter, that counsel even knew of the existence of the witnesses. The government did not produce any evidence explaining trial counsel's decisions or refuting appellant's claim that counsel ignored his requests to interview Mr. Williams and appellant's family members. *See Gillis v. United States,* 586 A.2d 726, 729 (D.C.1991) (remanding because "[t]he record is devoid of any meaningful explanation as to why a potential defense was not pursued" and "[a]t a minimum, there was a serious question regarding the need for a hearing").

Finally, the government argues that, due to the strength of its case at trial, appellant could not possibility satisfy the second prong of the *Strickland* test, even with his affidavits, by establishing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052. The government did not rely on the strength of its case in its presentation to the motions judge and, as a general rule, we do not consider arguments "not properly raised and preserved [in the trial court.]" *Bradley v. United States,* 881 A.2d 640, 646 n. 5 (D.C.2005) (quoting *Miller v. Avirom,* 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967)). In any event, we think that the government may overstate the strength of its case and underestimate the persuasive power of the affidavits if believed as alibis.

To be sure, LL and NN each identified appellant, in and out of court, as the man who assaulted her. Each witness also testified at trial that she was certain that appellant was the assailant. However, "[t]he vagaries of eyewitness identification, and the potential for wrongful convictions or adjudications based upon such evidence, have long been recognized in the District of Columbia." *In re As.H.,* 851 A.2d 456, 459–60 (D.C.2004) (citing *United States v. Telfaire,* 152 U.S.App. D.C. 146, 149–51, 469 F.2d 552, 555–57 (1972) (per curiam); *Crawley v. United States,* 320 A.2d 309, 311–12 (D.C.1974)) "Even if the witness professes certainty, 'it is well recognized that the most positive eyewitness is not necessarily the most reliable.'" *Webster v. United States,* 623 A.2d 1198, 1204 n. 15 (D.C.1993) (quoting *Crawley, supra,* 320 A.2d at 312).

Here, both the circumstances surrounding the identifications of appellant, and the descriptions given by the complainants of their assailant, may have given the jury some reason to pause. Although both complainants claim to have viewed their assailant in well-lit rooms, the testimony of each establishes that she was only able to view her assailant for a limited amount of time, during an extremely traumatic event. While NN, who testified that she was 5′4″, described her assailant as somewhere around 5′8′ and only slightly taller than she was, appellant testified that he was six feet tall. LL, moreover, described her assailant at trial as between 5′8′ and 5′10″, but informed the police that he was six feet tall. Furthermore, NN described her

assailant to the police as darkly complected and clean shaven, but testified at trial that he had a "lighter brown complexion" and "a little hair right on his chin." Finally, NN failed to identify appellant as her assailant at the first lineup she attended. Although she testified that she had recognized appellant, but did not identify him because she felt ill and afraid, the jury may have viewed that testimony with greater skepticism if it had also heard testimony that appellant was working when NN was assaulted. The serology evidence presented by the government at trial was of little consequence. As the trial was held in 1986, DNA evidence was apparently unavailable.[46] The evidence here was based on crude science, and established only that appellant, along with a very large percentage of the population, could "not be excluded" as the attacker.

The presence of appellant's prints at NN's home unquestionably presents a serious problem for appellant. In *Newman, supra,* however, we held that appellant was entitled to a hearing on his § 23–110 motion, despite the presence of his wallet at the crime scene, in part, because appellant asserted in his motion that he had been at the crime scene earlier on the day of the crime. 705 A.2d at 262.

There, Newman and his co-defendant Samuels were convicted of various crimes related to an incident in which they allegedly burst into an apartment and robbed the occupants, shooting and killing one of them. *Id.* at 249–50. Among the physical evidence presented by the government was Newman's wallet, which was found at the crime scene. *Id.* at 250–51. Newman's photo identification was discovered inside the wallet. *Id.* at 250.

Following his conviction, Newman filed a § 23–110 motion in which he alleged that his trial counsel's failure to contact an alibi witness constituted ineffective assistance of counsel. *Id.* at 260. In the motion, Newman also asserted that "he had been [at the apartment where the crime occurred] earlier on the day of the crime and at that time had left his wallet there by accident." *Id.* Newman attached two affidavits. *Id.* In his own affidavit, Newman claimed that although he had informed counsel of the witness's existence, counsel did not contact her. *Id.* In a second affidavit, the alibi witness stated "that Newman had been with her at her home-a significant distance from the murder scene—from approximately six or seven in the evening until about midnight on the day the crime occurred." *Id.* We noted that "[b]ecause the murder took place at approximately 8:30 to 9 p.m., [the witness's] testimony—if believed—would have completely exonerated Newman." *Id.*

We also observed that "[t]he motions judge denied the motion without a hearing and without calling for an answer from the government." *Id.* (internal footnote omitted). The judge based his decision largely on the presence of Newman's wallet at the crime scene and the failure of the alibi witness to account for the wallet's presence. *Id.* at 260–61. According to the motions judge, "it is highly unlikely that [the witness] would leave out such important information in her affidavit." *Id.* at 261. The judge further asserted that "because [the witness] could not explain away the government's 'overwhelming evidence,' Newman could not show prejudice from his attorney's failure to contact [the witness]." *Id.*

In reversing the trial judge's order denying Newman's § 23–110 motion without a hearing, we rejected the conclusion that "the government witnesses provided such

---

46. *See supra* note 19.

overwhelming evidence of Newman's guilt that a hearing on [the alibi witness's] credibility was not necessary," observing:

> Three witnesses identified Newman as someone present at the scene of the crime, but two of these witnesses admitted they had smoked crack cocaine and drunk alcohol immediately before the robbery, and there was testimony that the third had done so as well. One of the witnesses, [an alleged accomplice], was severely impeached with evidence of her plea bargain, prior convictions, and previous inconsistent statements. The other two—the complaining witnesses— had failed to identify either defendant from a photographic array. And, only after a newspaper article about the murder had appeared did they identify Newman and Samuels as the assailants. If the jury had received the benefit of [the alibi witness's] testimony that Newman had been with her elsewhere at the time of the shooting, therefore, it might have resolved the conflicts between Newman's and the government's versions of events in Newman's favor.

*Id.* at 261–62.

Turning to the issue of Newman's wallet, we further concluded:

> Contrary to the motions judge's ruling, . . . the presence of Newman's wallet at the scene of the crime does not negate the exculpatory testimony of an alibi witness as a matter of law. Trial counsel told the jury in closing argument that "there's no evidence to show that [Newman] wasn't there earlier in the day," and that "[t]he only other person that would have known that is [a] woman who hasn't testified. . . . Furthermore, we cannot know whether, if [the alibi witness] had testified, Newman himself would have taken the stand to present his explanation about the wallet. . . . While the jury might have found

this proffered explanation—that Newman happened to come by the apartment on the very day of the murder and accidentally left his wallet there—too incredible to believe, it also could have found the combination of an alibi witness and the defendant's version of how the wallet got there believable. Without a hearing to assess the credibility of the witness, however, we cannot tell what a jury might have done".

*Id.* at 262 (internal citation omitted).

We further stated:

> [W]e cannot agree with the motions judge that "it is highly unlikely that [the alibi witness] would leave out such important information [as to how Newman's wallet innocently came to be at the crime scene] in her affidavit." While [the witness's] failure to mention the wallet might affect her credibility, it does not as a matter of law make her testimony incredible—even if only because there is no discernible reason why [the witness] could have been expected to know anything about Newman's wallet . . . In any event, the jury might have believed [the witness] despite the presence of the wallet; without a hearing to assess her credibility in the context of the other evidence, we cannot tell. Therefore, because the record here is "barren of the evidentiary facts which would either confirm or refute [the] allegation" that Newman's attorney failed even to attempt to contact a potential alibi witness, Newman is entitled to a hearing on his § 23–110 motion.

*Id.*

The situation involving the presence of Newman's wallet at the crime scene in *Newman* is analogous to the situation involving the discovery of appellant's fingerprints and palm print at the home of NN. Unlike Newman, however, appellant offered an explanation for the presence of

his prints at trial. Certainly, his explanation posits an unlikely coincidence, which the jury was under no obligation to credit. However, as in *Newman*, the testimony of an alibi witness here could have provided greater credibility to appellant's explanation. At the very least, the fingerprint evidence cannot be viewed as so conclusive that it itself destroys the credibility of the proffered alibi witness.

The government, relying on our holding in *Johnson v. United States*, 683 A.2d 1087, 1094 (D.C.1996) (en banc), contends that the two crimes "tended to prove" each other. However, the jury acquitted appellant of all of the charges relating to the assault on AA, despite similarities between that crime and the other two crimes. Although, unlike the assaults on LL and NN, the assault on AA did not involve a burglary, AA was robbed and sexually assaulted at knife point, as were the other two complainants. The three complainants' descriptions of their assailant, moreover, were very similar. Finally, AA and LL were both asked by their assailant if they had ever had sexual intercourse with an African American man.

Appellant's acquittal of the charges relating to AA tends to undermine the government's arguments about the strength of its case. Certainly, the evidence surrounding the assault on AA was arguably weaker than the evidence relating to the other two assaults, because of AA's initial identification of the wrong man. Unlike NN's case, moreover, the government presented no prints placing appellant at the scene of the assault on AA. Like the other two complainants, however, AA picked appellant out of a lineup and made a positive identification of him at trial. Unlike the identifications made by the other two complainants, the identification made by AA was corroborated by her testimony that her assailant was not circumcised. In any

event, while the similarities in the assaults on LL and NN may indeed strongly suggest that they were perpetrated by the same individual, the challenge is whether, with the proffered alibi witnesses, that individual was beyond a reasonable doubt the appellant.

In short, we do not think that the evidence presented by the government, while undeniably strong, was so overwhelming that it conclusively established, without a hearing, that appellant was entitled to no relief, whatever the possible strength of the proffered testimony of the alibi witnesses might be on further assessment. Because appellant "allege[d] facts which, if demonstrated, would establish ineffective assistance of counsel," *Lane, supra,* 737 A.2d at 548 (quoting *Johnson, supra,* 385 A.2d at 744), and because "[t]he exculpatory value of the evidence proffered by appellant turns at bottom on the credibility . . . of the witnesses specifically identified in [his] § 23–110 motion," *Newman, supra,* 705 A.2d at 261 (quoting *Rice v. United States,* 580 A.2d 119, 122–23 (D.C.1990)), we conclude that it was improper for the motions judge to summarily deny appellant's motion. In so doing, we emphasize, as we did in *Newman,* that "we do not address the [ultimate] merits of [appellant's] claim." *Id.* at 262 (citing *Gray, supra,* 617 A.2d at 524).

For the foregoing reasons, we vacate the order denying the § 23–110 motion and remand the case to the trial court for further proceedings consistent with this opinion.

*So ordered.*

KRAMER, Associate Judge, concurring:

As the majority notes, *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), provides that to prevail on a claim of ineffective assistance of counsel, a defendant must show both

that the performance of counsel was deficient and that he was prejudiced by that deficiency. To meet the test, a defendant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Id.* at 687, 104 S.Ct. 2052 and that the defendant suffered prejudice because "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Because of what I perceive to be the strength of the evidence in this case (and the deficiencies of the affidavits presented to Judge Dixon), I am persuaded that there is no realistic possibility that Mr. Jones was prejudiced by any of the asserted deficiencies of counsel.

D.C.Code § 23–110(c) provides a presumption that there will be a hearing on an ineffective assistance of counsel claim. It also provides, however, that such a hearing is not necessary if "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." In my judgment, the motion, files and records of this case "conclusively show" that the defendant committed the acts of which he was convicted and thus should be entitled to no relief. But the government did not rely on the strength of its evidence in its presentation to Judge Dixon, and, as Judge Steadman points out, as a general rule, we do not consider on appeal arguments that were not presented below. Nonetheless, because I view the strength of the evidence so differently from the majority, I concur and explain.

As I detail herein, the evidence with respect to the offenses against Mrs. N. and Mrs. L. is overwhelming (and, contrary to the views of the majority, the evidence with respect to the offenses against Ms. A., on which the appellant was acquitted, entirely irrelevant to the issues now before us). This is because the evidence that pertains to the matters involving Mrs. N. and Mrs. L. individually is stronger than assessed by the majority, and, more importantly, the evidence of the offenses against each of these two victims is inherently intertwined and provides virtually irrefutable corroboration of the defendant's guilt of both. Indeed, I note that in the order of February 12, 1988, affirming the original convictions, this court held that the trial judge had not erred in declining to sever the offenses involving Mrs. N. from those involving Mrs. L. because the "numerous similarities between the manner in which the two offenses were committed as well as the relatively few differences between them" made them mutually admissible.

In contrast, the affidavits submitted in connection with the § 23–110 motion are weak and unpersuasive, filled with inconsistencies, refuted by Mr. Jones' own testimony at trial, and replete with unanswered questions, such as why Mr. Jones' sister did not come forward at an earlier time. In that regard, I note that while § 23–110 is designed to ensure that innocent defendants have recourse when they have been the victims of ineffective counsel, the weight of finality should dictate that legal game playing not be encouraged at that stage of the proceedings. Rather, the cards should be put on the table.

To explain my differing assessment, I provide my own rendition of the facts. Although the crimes against Mrs. N. came after those against Mrs. L., I begin with the offenses involving Mrs. N. since the evidence of these crimes, in my assessment, is sufficient to prove them not "merely" beyond a reasonable doubt, but practically to "a mathematical certainty"— a standard that involves a degree of evi-

dence that goes beyond what is necessary to convict an accused.[1]

### The Crimes Involving Mrs. N.

The trial record shows that on April 22, 1985, Mrs. N., a native of Haiti, lived with her husband and four children in a home located in a heavily wooded area on a part of Quebec Street, Northwest, that is adjacent to Rock Creek Park and a block or so off Connecticut Avenue. The testimony was that there are only a few homes on this part of Quebec. In order to reach them, you enter Quebec from Connecticut and continue onto what appears to be a dead-end street. The nearest house to Mrs. N.'s is approximately seventy-five feet away.

On Monday, April 22, 1985, at approximately ten o'clock in the morning, Mrs. N. was in an upstairs bedroom making a bed while three of her children, ages 1, 2 and 6, played nearby. Suddenly, she heard one of the children scream and looked up to see a man four to five feet from her holding a three-foot long pipe and a six-inch long steak knife. Although he immediately directed Mrs. N. and her children to close their eyes, she testified that it was "broad daylight," and that she "took a good look at [his] face," that is, "his entire face," and would never forget it.

The intruder threatened to kill her if she spoke or screamed, then grabbed her by the back of her robe, put the knife he carried to her neck, and dragged her from room-to-room on the second floor, directing her six-year old son to carry the one-year old baby. Mrs. N. described his demeanor as "hyper" and "mean," and commented that "he knew exactly what he was doing" and that "his voice showed that." For example, "he knew exactly what drawer to look [in]," and went "through all of the drawers" where she had her jewelry. Further, "[h]e knew how to put the [knife] in my throat the whole time," and "how to pull the back of my robe and drag me down and up."

Eventually, the intruder put the children in the library on the first floor and ordered them to stay there. With the knife to her throat, he then continued to drag Mrs. N. up and down the stairs, pulling her by the back of her robe and demanding money and jewelry. After locating about $60 in currency, he ransacked the house and took several thousand dollars worth of jewelry that he had found from searching the drawers.

After that, he obtained a pair of black stockings, tied Mrs. N.'s hands tightly behind her back at the wrist, gagged her with one T-shirt and blindfolded her with another. Using his knife, he proceeded to cut open the T-shirt she was wearing, removed her panties and raped her, biting her nipple so hard that it left the impressions of his teeth. He then left the house, warning Mrs. N. before going not to call the police for at least forty minutes and stating that "the police want him badly."[2] After his departure, Mrs. N. discovered that all five of her telephone lines had been cut. Thus, she dressed and with her children sought refuge at the home of a neighbor, who called the police.

In her trial testimony, Mrs. N. described this man as wearing a white shirt, light blue jeans with big pockets, high top tennis shoes and a red baseball cap. She

---

1. *See* Criminal Jury Instructions for the District of Columbia, No. 2.09 (4th ed. Rev. 2005) ("The government is not required to prove guilt beyond all doubt, or to a mathematical or scientific certainly.")

2. The record is silent with respect to why the police "wanted him badly." Surely, the attack on Mrs. L. would provide a justification for the police "wanting him badly."

noted that the sleeves on his shirt and jacket were rolled up. She described the jacket as a jean jacket—"a short jacket, not a long jacket." She also noted that his shirt was buttoned and worn open, that is, without a tie.

Mrs. N. testified that she is 5′4″ tall, recalled the intruder as "appear[ing] a little bit taller than" she was, and, in response to a question from defense counsel, agreed that he "was not a lot taller." According to her, he had a little hair "right on his chin." She described his complexion as having imperfections, like little moles or pimples, and as being of a lighter brown shade (the same shade, she testified, as the defendant, whom she identified in court as her assailant). Her ability to recall these details of his physical characteristics and clothing in such detail underscores her opportunity to observe him and bolsters the credibility of her subsequent identifications of him. Furthermore, it was not until near the end of this series of events that she was actually blindfolded. With respect to his voice, she heard it repeatedly as he gave commands to her and the children. Indeed, she testified that as with his appearance, she would never forget his voice.

Moreover, Mrs. N.'s trial testimony describing her assailant was much more detailed than the description that she gave to Officer Frederick Scott, who was the first officer to speak with her after these traumatic events. Mrs. N. told him that her assailant was about 26 years old, about 5′8″ tall, with a slim build, wearing blue jeans, a red baseball hat and high-top tennis shoes. She also described him as clean shaven and dark complected. When Mrs.

N. was shown a photo array the day after the assault that did not contain a photo of the appellant, she made no identification.

On Sunday, April 28th, six days after the assault, Mrs. N. testified that she received a phone call from the same man whose voice she recognized as that of the man who had invaded her home. He said, "I told you that you shouldn't have called the police. I will come back to kill you." The next day, on Monday, April 29th, he called again, but all he said was, "Today is Monday." There was no doubt in her mind that both phone calls came from her assailant, and in any event, the words spoken by the caller themselves confirm that it was the same person.[3]

The timing of these phone calls corresponds directly with the stop of Mr. Jones that took place around 1:00 a.m. on April 28, six days after the offenses involving Mrs. N. and a little over a month after the offenses involving Mrs. L. described below. The stop was the result of a police detail in the spring of 1985 that provided surveillance to the area of the 2600 block of Porter Street, the 2700 block of Quebec Street and the 2600 and 2700 blocks of Klingle Road for the purpose of spotting persons who matched the description given in connection with these crimes. Specifically, the police lookout was for a black male in his twenties, between five-ten and six feet tall, who weighed about 160 pounds and was wearing blue jeans, white tennis shoes and a red baseball cap. When Detective Lawrence Noyes spotted Mr. Jones on that date, he was wearing white tennis shoes and had a red hat with a Popeyes insignia sticking out of the pocket of his coat that matched the de-

---

**3.** At trial, Mr. Jones testified at length about what he was doing on Porter Street at 1:00 a.m., including a story about a robbery involving two "Puerto Ricans" in which he was cut and ended up at the hospital, leaving behind his backpack that he was on his way to retrieve. In the end, however, this testimony appears to be no more than a diversion that does not go to the heart of the issue of his guilt or innocence.

scription that an officer in a scout car had reported he was wearing when first seen.

Mr. Jones was stopped "right in the rear and down from the [Mrs. L's] house" next to a set of stairs that go from the 2600 block of Porter Street up to the 2600 block of Klingle Road, where Mrs. L.'s house is. The stairs are about a city block away from Mrs. N.'s home. Norris saw a ring around the whole back of Mr. Jones' head that appeared to be made by a cap like the one in Mr. Jones' pocket. The police took Mr. Jones to the station and obtained his name and photograph. At trial, Mr. Jones testified that he left for New York almost immediately after this encounter with the police.

The majority is troubled by the fact that Mrs. N. did not make an identification when confronted with the defendant in a line-up on November 5, 1985. But, as she explained, when she recognized the man who had attacked her, she was so "petrified" that she felt ill—like she was about to pass out-and instead of identifying him, she said that she did not recognize anyone. There was not the slightest suggestion in the record that Mrs. N. was being untruthful about this. Moreover, several weeks later, on December 9, 1985, when she was called to appear before the Grand Jury and shown a photograph of the lineup, she identified the defendant as her assailant. During the trial, when asked if she could make an in-court identification, she responded: "I don't have to look very far. He's across, sitting across from me, right here."

At trial, Officer Charles Hale, a police crime scene search officer, testified that on April 22, 1985, the date of the offenses, he and a second officer were assigned to look for evidence outside of the Mrs. N.s house, particularly toward the rear and sides. Thus, they dusted the basement windows and the basement door for fingerprints.

From the area of a window near the basement door two fingerprints and one palm print of Mr. Jones were recovered. Specifically, his left middle fingerprint and left ring fingerprint were identified as coming from the frame of the window screen of an area near the basement door. It came not just from the window pane itself, as might be expected if a person was merely looking in a window. Rather, it came from the area where the screen fits into the frame. As described by Officer Hale, the area is right next to the stone of the house where there is a wooden frame for a window. The defendant's right palm print was also identified on a metal frame of the screen of the same window.

Asked if she was able to determine how the assailant entered her home, Mrs. N. testified that she believed that it must have been through a screen door that she had left open—but latched with a hook—after watering some plants outside that morning. As she pointed out, all of the other doors to the house were locked. She identified Government Exhibit No. 37 as a picture that depicted the door that she had left latched. Officer Hale identified Government Exhibit No. 38 as a picture that depicted the screen where the fingerprints were found. He testified that Exhibit No. 37, the photo identified by Mrs. N. as showing the screen door that she had left open and latched, showed a patio area located immediately above the window where the latent fingerprints were discovered.

During his testimony, Mr. Jones sought to explain how his fingerprints could have been on the screen at Mrs. N.'s house. He testified that he had quit his job at Popeyes in March, and began hiking regularly in Rock Creek Park in April. One day in early April, he testified, he got lost and ended up on a narrow dirt road. Across from him were some woods and further

away was a house. He kept walking straight and ended up in the back yard of the house. He looked into the window of the house for a few minutes because he wanted to see how it was built and saw furniture inside. The window that he said he looked through was a basement window.

In response to the prosecutor's question about why he had touched or moved the screen on the basement window, Mr. Jones testified that he did not recall moving the screen or even seeing the screen, but only looking though the window. After doing so, Mr. Jones testified, he left and re-traced his path, ending up at Pierce Mill, a location with which he was familiar. He testified that he only hiked in the area of Mrs. N's house that one time, which was in early April, a time he recalls because it had begun to get warm. He acknowledged that he knew the area of Porter Hill (his name for the portion of Porter Street near the homes of Mrs. N. and Mrs. L.) and "the bike trail underneath the bridge and where the zoo is at." Moreover, at that time, he lived only about a mile from there.

When asked by the prosecutor if on April 30th he knew that the police were looking for him, Mr. Jones replied that he did not. He testified that he left the District on April 30 or May 1, 1985, because he was stopped by the police that night, and as a result he decided that Washington "wasn't the place for him any more." Thus, he went to live with his grandfather in Brooklyn, New York. It was not until he returned to the District, he testified, that he learned that the police were looking for him. The testimony of Detective Patrick Shine, on the other hand, was that when he spoke with Mr. Jones after his arrest, Mr. Jones told him that he learned of the warrant, which had been issued on April 29, 1985, and sought counsel from his

mother's boyfriend, who told him to "get out of town."

Thus, what we have with respect to the crimes against Mrs. N. is a fingerprint of Mr. Jones on a window screen on the ground floor of her house. That, of course, would not in itself be sufficient to show him guilty of these crimes, particularly given his explanation, which has some degree of plausibility. But there is no suggestion that Mrs. N. had any occasion to see the person looking into the basement window. Thus, the chance that she would identify as her assailant the same person who got lost in Rock Creek Park and accidentally stumbled upon her house, leaving his fingerprints on a basement screen, is extremely remote. The probabilities are reduced further when the assailant calls and threatens Mrs. N. for contacting the police on the very day and the day after the police have stopped Mr. Jones, taken him to the station and photographed him. And one more factor supporting the accuracy of Mrs. N's identification, albeit of much less moment, is that by his own admission, he fled to New York within a day or two of this encounter, thereby avoiding the arrest on the warrant that was so expeditiously obtained. Thus, I conclude that the evidence of Mr. Jones' guilt in Mrs. N.'s case is overwhelming and indeed, sufficient to "conclusively show" that the defendant committed the acts of which he was convicted, and further that the alleged deficiencies of his trial counsel did not cause him prejudice. In addition, however, as I will show following review of the facts of the crimes against Mrs. L., the convictions with respect to the offenses involving Mrs. N. are also supported by the mutually admissible evidence of those offenses, which occurred approximately six weeks before.

### The Crimes Involving Mrs. L.

In March 1985, Mrs. L. and her husband lived in the 2600 block of Klingle Road,

Northwest. As one police officer described it, the distance between the Mrs. L.'s home and Mrs. N.'s home, "although up and down hill," if calculated "straight through the woods in a straight line would be approximately three hundred yards." Porter Street lies in between the two houses. Mrs. L.'s home is built on a hill and like Mrs. N.'s home is in a wooded area. Steps beginning on Porter Street lead up to the area of Mrs. L.'s home.

Around 10:00 p.m. on the evening of March 14, 1985, Mrs. L., then twenty-nine years old, was at home alone. While in her bedroom, Mrs. L. heard glass breaking and saw a man enter through the broken sliding glass doors of the room with a large rock in his hand. The bedroom was well-lighted with a lamp that had a 150 watt bulb by which Mrs. L. could easily read and with additional light from the television, which was on. From the distance of about a foot, she had an opportunity to get a good look not only at the man's face, but at his entire person for a period of eight to ten seconds before he grabbed her

The intruder placed a knife at Mrs. L.'s throat and put his hand over her mouth. He told her to stop screaming, turned her around so that he was behind her and ordered her not to raise her head and not to look at him. She estimated that during the time he was in her home, he reiterated his command for her not to look at him at least "a dozen" times. As he dragged her from room-to-room and back, looking through drawers and closets, and ransacking them in his search for items to steal, he continued to hold the knife to her neck, later exchanging it for a meat cleaver that he found in the kitchen. Upon discovering her bank card, he demanded the number from Mrs. L. and threatened to come back and kill her if the number she gave him turned out to be incorrect.

By the time he discovered the bank card, Mrs. L. testified, her assailant was "considerably rougher," and had gotten so "progressively ... through the evening," Even at the beginning, however, when he first entered her bedroom, he was rough, according to Mrs. L., "grabb[ing][her] very hard and put[ing] his hand over [her] mouth and [holding her] very securely." As Mrs. L. put it, "he was rough at the beginning and then he got worse." With two exceptions, as they went through the house so the intruder could determine what he wanted to steal, he kept her back to him and the knife or cleaver at her throat, repeatedly telling her not to look up.[4]

Eventually, they returned to the living room for the final time. Once in the living room, the intruder demanded that Mrs. L. disrobe, which she did after failing to dissuade him from what she correctly anticipated was his intended course of action. He tied her hands behind her back with her pantyhose, making them extremely tight on her wrists, and blindfolded her by tying her blouse tightly over her eyes. Then he raped her.

Thereafter, Mrs. L. could hear him unplugging stereo equipment. He returned to her, wrapped a stereo cord around her neck, and told her that he could kill her if he wished. He also threatened to come back and chop off her head if she reported him to the police. The last she could remember was his pulling the cord tighter and tighter around her neck until she lapsed into unconsciousness. Within about ten minutes, Mrs. L. estimated, she regained consciousness and heard the sound of a car going down the road leading to her

---

4. The two exceptions occurred in two separate bedrooms when he ordered her to lie on the bed and not look at him as he ransacked the rooms.

house. While she had seen the intruder cut two phone cords, she recalled a third line in a home office and struggled to that phone in order to contact the police. She later discovered that her car was missing. In addition, the intruder took $60, her bank card, her watch, a cameo pin, a VCR, and the stereo equipment.

Mrs. L. estimated that she was with the intruder for a little over an hour. Her best opportunity to see him, she testified, was when he first entered her well-lit bedroom. She was able to look at not only his face, but "his entire person" for eight to ten seconds from the distance of about a foot before he grabbed her and told her not to look at him. Despite his warnings, however, she did have additional opportunities to view him. On two occasions, she looked up and got a good side view of his face. One of those occasions was on a re-visit to the her bedroom and another was in the kitchen, where there were eight recessed overhead lights shining. On these two occasions, she "saw his face from the side" "for several seconds, maybe five at the most." Thus, while she got "the best look at him when he entered the home," which she estimated as for a period of eight to ten seconds, she also got "a good side view of him" on two other occasions and was able to see him intermittently when they returned to the living room for the final time as he looked out of the window and walked to her side.

The first police officer to respond to Mrs. L.'s call was Officer Tilman Nungesser, who was assigned to investigate the call at about 11:13 p.m. He testified that Mrs. L., who was suffering from the results of being strangled, reported to him that she had been assaulted by a black male, approximately six feet tall, under the age of thirty, wearing a blue jacket and blue jeans. Officer Nungesser had an opportunity to see Mrs. L's bedroom, and

observed the broken patio door and the jewelry cases strewn about the floor.

At trial, Mrs. L. was able to describe the intruder and his clothing in minute detail. She testified that he was a black male about 24–25 years old, who was about 5'8" to 5'10" tall. He was "very even featured" and there was "nothing at all that struck [her] as being unusual or noticeable in any way." He was wearing a red baseball cap that she described as a bright red color, not maroon. She could not recall if it had an insignia on the front of the cap. He was also wearing "fairly new" white sneakers and although "[t]hey did not look like they were new . . . they looked like they had just been cleaned, and there was an emblem on the side of them very much like a Nike emblem." She further testified that "[i]t also looked like the emblem at one time had been a darker shade of blue and had faded out." The sneakers "were a mix of material, maybe nylon and leather or nylon . . . canvas—[n]ot all one material." In addition, she recalled that the man was wearing blue jeans, which did not look like designer jeans, but they did look relatively new and the stitching at the bottom looked like what would be on a pair of Levi's. She also noted that he was wearing a lightweight dark blue cloth jacket with no identifiable brand name.

Mrs. L. attended two line-ups. The appellant was not included in the first one, and Mrs. L. made no identification. At a second line-up, where the appellant was included, she identified him as her assailant. At trial, she identified Mr. Jones in court and indicated that he looked the same as he had on March 14, 1985. She testified further that there was no doubt in her mind that he was the man who broke into her house and raped her. Thus, as with the offenses against Mrs. N., the evidence of Mr. Jones' commission of the offenses against Mrs. L. is also strong.

But, as I now discuss, when the similarities in these two incidents are compared, the evidence that Mr. Jones committed both becomes simply overwhelming.

## Similarities in Offenses

As this court pointed out in affirming the convictions, the similarities between the crimes against Ms. L. and the crimes against Mrs. N. makes them mutually admissible, and thus neither set of offenses stands alone. Rather each is supported by the corroborating evidence resulting from the similarities between them. First, the descriptions given by Mrs. N. and Mrs. L. correspond in numerous ways. Both agree that the intruder was a black male and describe him as in the same age range-Mrs. N. as around 26 years old; Mrs. L. as from 24–25 years old. Both say that he was wearing a red baseball cap, blue jeans, and a blue jacket. At trial, Mrs. N. estimated his height as 5′8″, while Mrs. L. estimated it as 5′8″ to 5′10″. Officer Nungasser reported that the night on the scene, Mrs. L. told him that her assailant was six feet tall and under 30 years old, a description which accurately describes Mr. Jones. Each victim adds additional details that the other does not, and while there is some discrepancy in the height, that is only to be expected.

But the similarities in the actions of the intruder are what takes this to a level of overwhelming evidence where there can be every confidence that the convictions were reliable. Those similarities are as follows:

1. The houses were within 300 yards of each other in somewhat secluded settings in out-of-the-way areas.
2. The burglar entered both homes carrying a knife.
3. The burglar made identical use of the knife, that is, the knife was held to the victim's neck, thus requiring the victim to face forward and minimizing the victim's opportunity to view her assailant.
4. The victims were dragged around and up and down stairs by the necks of the garments they were wearing while the intruder searched the house for valuables worth stealing.
5. Both victims described the burglar as "mean" or "rough." He threatened to kill Mrs. N. if she spoke or screamed, and ordered her six-year old son to carry the baby. Mrs. L. described him as "rough at the beginning and then he got worse."
6. The burglar checked every room in each house and ransacked them for valuables.
7. The burglar appeared experienced and confident in his actions, not unsure of himself.
8. The burglar warned both victims that they would be killed if they took certain action-Mrs. N. if she spoke or screamed or if she called the police after his departure; Mrs. L. if the number for her bank card was not accurate (and noted, as he strangled her, that he could kill her if he wanted).
9. The burglar cut the telephone lines in each house before leaving.
10. Before the rape, the burglar tied the wrists of both victims tightly behind their backs using each victim's panty hose.
11. Before the rape, the burglar used the tops worn by each victim—a T-shirt in the case of Mrs. N. and a blouse in the case of Mrs. L.—to blindfold them.
12. The burglar added gratuitous violence to each rape, strangling Mrs. L. until she lost consciousness and biting the nipple of Mrs. N. so hard that it left the indentations of his teeth.

There is no suggestion that Mrs. N. and Mrs. L. knew each other or coordinated

their identifications of Mr. Jones as their assailant. Rather, what exists are solid identifications by both victims backed up by the fingerprint evidence, the calls to Mrs. N. on the same day as the police stop, and a dozen ways in which the intruder's actions during each set of offenses were parallel to the other.

## The Affidavits

Arrayed against this evidence are three affidavits and three documents submitted in connection with the motion for a new trial. One of the affidavits, from Mr. Jones' sister, Malisa Jones, avers that he was seriously ill and under her constant care and watch on March 13, 14 and 15, 1985, that he did not leave her home, and that she "attended to [his] needs frequently" as a result. She states unequivocally that he did not leave her home at any time those days. But her affidavit is undermined in this respect by Mr. Jones' own affidavit in which he avers he left her home and went to Popeyes on March 13, got into an argument with his supervisor and quit his job. Moreover, there is no explanation for why she would not have testified to this at his trial. Though Mr. Jones, in his affidavit, asserts that his trial counsel never contacted his family, as Mr. Jones requested (an assertion quite undercut by the testimony at trial of his uncle, Markell Jones), that would not alone appear to explain why she would not have come forward with this critical alibi testimony pertaining to the charges involving Mrs. L. In addition, as Judge Dixon noted, "no assertion is made that the defendant's family was unaware of his arrest or that any family member was denied the opportunity to come forward and testify at the defendant's trial."

In April of 1985, according to Mr. Jones' affidavit, he became re-employed at Popeyes. He asserts that he filled out an information sheet in connection with his re-employment, which is an attachment to the motion. He avers that on April 22, 1985, he was scheduled to work the same shift as John Havins, Roland Jones and Andre Williams. He further avers that those time sheet records obtained from Popeyes indicate that he worked a shift beginning at 6:30 a.m. and ending at 5:30 p.m., thus establishing an alibi for the offenses involving Mrs. N.

As Judge Dixon pointed out, however, Mr. Jones' "time card and work schedule conflict as to the days and times defendant worked, and the defendant's own testimony conflicts with the work schedule that defendant submitted in support of the underlying motion." Putting aside for the moment that the Work Schedule has neither a month nor a year on it (in addition to the lack of a Popeyes name) and further assuming that it is for the week of Sunday, April 20, to Saturday, April 27, it would have had Mr. Jones working from "10:00" to "5:00" on Monday through Thursday. But the time card itself, also of questionable authenticity, has him working from 6:30 a.m. to 5:20 p.m. on Monday, from 7:00 a.m. to 12:18 p.m. on Tuesday, from 6:32 a.m. to 5:23 p.m. on Wednesday, and from 7:00 a.m. to 5:22 p.m. on Thursday.

Mr. Jones asserts that he requested that his counsel interview Andre Williams to confirm that they were both working at that time. Should Mr. Williams testify to that, however, this would be inconsistent with Mr. Jones' own trial testimony that he had quit his job in March and was not working in April. Indeed, Mr. Jones testified to this for the vital purpose of explaining why his fingerprints were found on the screen of Mrs. N.'s home. Specifically, he said that after he quit his job in March, he was able to start hiking "deeply" in April in the area by Rock Creek Park behind the zoo. Thus, this was hardly an offhand remark, but a critical part of his defense

and seriously undercuts the representations in his affidavit that he had become re-employed at Popeyes in April. And it is worth noting that the trial itself was in February 1986, so that he could certainly be expected to recall correctly whether he was working in April—only ten months before.

In addition, the documents submitted with respect to his work schedule—specifically an "Information Sheet," the "Popeyes Work Schedule" and a time card dated April 28, 1985—raise serious issues of authenticity. In the affidavit of Andre Williams, he avers that he obtained these in 1992, which would be seven years after the events at issue. Neither the Information Sheet nor the time card even indicate that they are Popeyes documents. And the Popeyes Work Schedule appears to be a computer generated document that could easily have been created on a home computer.

Mr. Jones also avers that before trial, he was unsure of his whereabouts on April 22, 1985, and asked his attorney to obtain the Popeyes employment records to see if he might have been working on the days that he was alleged to have committed the offenses and that his attorney failed to follow through on that suggestion. But during the trial, Mr. Jones identified a time card, which was Defense Exhibit 2, that he testified showed him to have been at work on January 23, 1985, the date of the offenses against Ms. A. for which he was acquitted. The introduction of this time card shows that, contrary to failing to search out these records, his counsel not only sought them out, but made use of what was helpful.

## Conclusion

In sum, contrary to the view implicit in the majority opinion, I conclude that the government's evidence of Jones's guilt was overwhelming.[5] For the reasons detailed above, this evidence easily met, if not exceeded, the standard of beyond a reasonable doubt. The record, on the other hand, convincingly refutes the belated allegations in the affidavits that Jones now proffers in his motion for post-conviction relief. Thus, I might well have been satisfied that "under no circumstances could [Jones] establish facts warranting relief." *See Joseph v. United States*, 878 A.2d 1204, 1209 (D.C.2005) (quoting *Ramsey v. United States*, 569 A.2d 142, 147 (D.C. 1990)) (internal quotation marks omitted), and that the trial court was therefore justified in denying the § 23–110 motion without a hearing. However, the government's decision not to argue the strength of its evidence before the trial court prevented the trial judge from conducting its own assessment of whether the *Ramsey* test had been met. For this reason, despite my own view that the evidence conclusively establishes Jones' guilt, I cannot disagree with the majority's decision to remand for a hearing. Thus, I concur rather than dissent.

---

5. Guilt, of course, is rarely established with absolute certainty. It is worth noting, however, that there is no indication that Mr. Jones has sought to take advantage of the Innocence Protection Act, D.C.Code § 22–4133, which would hold out the possibility of scientific exoneration should his DNA not match the DNA on the swabs taken from the victims.